**RICHMAR DEVELOPMENT, INC., Plaintiff,**

v.

**MIDLAND DOHERTY SERVICES, LTD., Philip H. Nicely, WTC Finance Group, Inc., and Strongbow Security, Ltd., Defendants.**

**No. C–C–88–535–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

July 19, 1989.

Hayden J. Silver, III, Moore & Van Allen, Charlotte, N.C., for plaintiff.

Jonathan E. Buchan and L.D. Simmons, II, Smith Helms Mulliss & Moore, Charlotte, N.C., for defendants.

## ORDER

ROBERT D. POTTER, Chief Judge.

### I. PRELIMINARY STATEMENT

THIS MATTER is before the Court on Defendant Midland Doherty Services, Ltd.'s Motion to Dismiss, filed February 13, 1989, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Defendant Midland Doherty Services, Ltd. ("Midland Doherty") asserts in its Motion to Dismiss that Richmar Development, Inc.'s claims against Midland Doherty should be dismissed because this Court lacks personal jurisdiction over Midland Doherty—a foreign corporation. Plaintiff opposes Defendant Midland Doherty's Motion to Dismiss and has requested a hearing.

■ Plaintiff and Defendant Midland Doherty, the sole remaining defendant,[1]

---

1. It is worthwhile to note here why Midland Doherty is the sole remaining defendant.

On February 3, 1989, the Clerk entered a default against Defendants Philip H. Nicely ("Nicely"), WTC Finance Group, Inc. ("WTC Finance"), and Strongbow Security, Ltd. ("Strongbow") because these three defendants failed to plead or otherwise defend as required by law. On June 1, 1989, this Court entered a Judgment—with a supporting Memorandum and Order—in favor of Plaintiff and against Defendants Nicely, WTC Finance, and Strongbow, jointly and severally, in the amount of (1) one million seven hundred twelve thousand four hundred ninety-nine dollars and twenty one cents ($1,712,499.21) in damages plus (2) eight thousand five hundred ninety-eight dollars and sixty cents

have conducted discovery on the personal jurisdiction issue and have filed briefs, reply briefs, affidavits, and other discovery materials to support their respective positions on the motion now before this Court. The Parties have briefed the issues adequately, and, therefore, this Court is of the opinion that oral argument would not significantly aid this Court's decision-making process; a decision can be made by referring to the briefs and the affidavits, Fed.R. Civ.P. 43(e).[2]

As will be explained in more detail below, Midland Doherty's Motion to Dismiss will be denied because the forum state's statutory law provides a basis for the assertion of personal jurisdiction over Midland Doherty and because Midland Doherty has sufficient minimum contacts with the forum state making it fair, reasonable, and substantially just to require Midland Doherty to appear and defend in the forum state against Plaintiff's claims, which arose from Midland Doherty's contacts with the forum state.

## II. QUESTIONS PRESENTED

The instant motion presents this Court with two questions:

(1) Does North Carolina's statutory law provide a basis for the assertion of personal jurisdiction over Defendant Midland Doherty?

(2) If North Carolina's statutory law does permit the assertion of personal jur-

($8,598.60) in attorneys' fees plus (3) the costs of this action.

2. The court's lament in *Munchak Corp. v. Riko Enters., Inc.*, 368 F.Supp. 1366 (M.D.N.C.1973), provides a succinct justification—applicable to the present case—for eliminating in civil cases unnecessary hearings:

In view of the increased filings in this District and the complexity of the same, it is essential that courtroom time be conserved as much as possible. The Court found the briefs of counsel most helpful in deciding this case, but is constrained to say that the oral arguments added little, if anything, toward additional understanding of the case.

*Id.* at 1375. Although the Parties' attorneys in the present case may be fine practitioners of the art of oral advocacy, the present case simply does not involve legal or factual issues requiring the expenditure of this Court's scarce—and valuable—courtroom time.

isdiction over Defendant Midland Doherty, then does such assertion of personal jurisdiction meet the due process requirements of the federal constitution?

## III. FACTS [3]

This case arises from Plaintiff's unsuccessful attempt to secure financing for Plaintiff's purchase of the First Union National Bank Building, the accompanying land, and an adjoining vacant lot—all located at or near 444 Seabreeze Boulevard, Daytona Beach, Florida (the "Florida Property").

Plaintiff Richmar Development, Inc. ("Richmar") is a North Carolina corporation that is primarily engaged in developing, and investing in, residential and commercial real estate. Richmar is based in Charlotte, North Carolina, and it is controlled by Richard G. Hoefling ("Hoefling") and Mark W. McGroarty ("McGroarty"). (McGroarty Aff. Exh. C).

Hoefling is the President of Plaintiff Richmar, and he acted in that capacity at all times relevant to the present case. McGroarty is the Secretary of Plaintiff Richmar, and he acted in that capacity since at least January 1988. (*See* McGroarty Aff. Exh. C ("In 1987, Mr. McGroarty became a 50% owner in Richmar Development, Inc.")). McGroarty is a Canadian citizen who—with his family—now resides

3. Rule 52(a) of the Federal Rules of Civil Procedure states, in pertinent part, "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)." Fed.R.Civ.P. 52(a). In the present case, however, this Court is of the opinion that it will be useful to provide the parties—and any reviewing court—with a detailed discussion on Defendant Midland Doherty's Motion to Dismiss. In so doing, this Court does *not* intend to make any findings of fact or conclusions of law regarding the ultimate merits of Plaintiff's claims against Defendant. Thus, any statements in this Order regarding Defendant's actions or its officers' actions are made solely for the purpose of determining the present motion; such statements should not, and must not, be construed as having any res judicata effect.

in Charlotte, North Carolina; McGroarty moved to Charlotte in August 1987. (McGroarty Aff. at 1). Prior to moving to Charlotte, McGroarty spent a substantial amount of time in Charlotte establishing residential and commercial real estate developments in the Charlotte area. (McGroarty Aff. at 1).

Defendant Midland Doherty is a Canadian corporation that has its principal office and place of business in Toronto, Canada. (McKenna Aff. at 2; Plaintiff's Response to Request for Admissions of Defendant Midland Doherty at 1, para. 1 [hereinafter Plaintiff's Admissions]). Midland Doherty is a wholly owned subsidiary of Midland Doherty Ltd., which is owned by Midland Doherty Financial Corporation, a holding company whose shares are traded on the Toronto Stock Exchange. (McGroarty Aff. Exh. B). Since 1977, Midland Doherty has been engaged in business as a residential and commercial mortgage broker. (McKenna Aff. at 2). In its business as a mortgage broker, Midland Doherty typically locates for borrowers various potential sources of funds, including, but not limited to, commercial banks, lending institutions, trust companies, and life insurance companies. (McKenna Aff. at 2). Midland Doherty completes approximately seventeen hundred mortgage transactions each year. (McKenna Aff. at 5).

Scott Douglas McKenna ("McKenna") is a Vice–President of Midland Doherty, and he was employed in that capacity at all times relevant to the present case. McKenna's principal duty for Midland Doherty is analyzing real estate investment portfolios, including residential and commercial real estate financing projects. (McKenna Aff. at 2). McKenna has never travelled to North Carolina. (McKenna Aff. at 5).

Midland Doherty markets its services as a mortgage broker by relying primarily upon its reputation; Midland Doherty's formal advertising efforts appear to be directed solely at the Canadian market. (McKenna Aff. at 4).

Midland Doherty does not own any real or personal property located in North Carolina, and it does not have an office or any employees or agents in North Carolina. (McKenna Aff. at 3–4; Plaintiff's Admissions at 2–3, paras. 7, 8, 12). Midland Doherty does not have any existing contracts with any individuals or business entities in North Carolina. (McKenna Aff. at 4). In 1986, however, Midland Doherty arranged financing for a German client that owned real property in Charlotte, North Carolina; the German client initially solicited Midland Doherty's services, and Midland Doherty, subsequently, arranged the required financing through a Canadian insurance company licensed and authorized to conduct business in the United States. (McKenna Aff. at 5; Plaintiff's Supplemental Admissions at 3, para. 13).

Defendant Philip H. Nicely ("Nicely") is an individual citizen and resident of the Commonwealth of Virginia. Defendant WTC Finance Group, Inc. ("WTC Finance") is a corporation existing under the laws of a state other than North Carolina, and it has its principal office and place of business in Bethesda, Maryland. Defendant Strongbow Security, Ltd. ("Strongbow") is a corporation organized and existing under the laws of Ireland, and it has its principal office and place of business in Dublin, Ireland.

For the purposes of determining the personal jurisdiction issue now before this Court, McKenna and McGroarty are the principal characters. Prior to January 1988, McGroarty had known McKenna for several years. (McGroarty Aff. at 1). At some point, McKenna informed McGroarty that Midland Doherty had been involved in the financing of the Arnold Palmer Center located in Charlotte (the "Arnold Palmer Center"),[4] and McKenna requested that McGroarty take a picture of the Arnold Palmer Center and forward it to him; McGroarty complied with this request. (McGroarty Aff. at 1). On or about February 25, 1986, McKenna sent to McGroarty, who was then living in Toronto, Canada, a

---

4. It is not clear from the record, but it appears that the Arnold Palmer Center is the real estate owned, at least at one time, by Midland Doherty's German client.

letter on Midland Doherty's stationery, which states, in pertinent part, the following:

Firstly, let me say that it was indeed a pleasure having the opportunity to meet with both yourself and Herb and discuss your past achievements as well as your future endeavors in the construction/development field.

*We hope that we afforded you both a little insight into Midland Doherty's Mortgage and Real Estate Divisions and how we may be of service to you in both the Canadian and U.S. markets. I trust we may be given the opportunity to prove ourselves effective allies.*

With respect to the [Arnold Palmer Center] in Charlotte, we would very much appreciate taking you up on your kind [offer] of photographing the property at your leisure.

(McGroarty Aff. Exh. A (emphasis added)). Prior to February 25, 1986, McGroarty had told McKenna of McGroarty's real estate projects in North Carolina. (McGroarty Aff. at 2). Since February 25, 1986, McKenna stated to McGroarty on several occasions that Midland Doherty remained interested in doing business with McGroarty in North Carolina and asked that McGroarty contact McKenna regarding any business opportunities in North Carolina for Midland Doherty. (McGroarty Aff. at 2).

After McGroarty moved to Charlotte in August 1987, McKenna telephoned him to inquire about several real estate projects McGroarty was then pursuing. (McGroarty Aff. at 2). McKenna again told McGroarty that Midland Doherty wanted to do more business in North Carolina and that McGroarty should contact him if he needed McKenna's services as a mortgage broker. (McGroarty Aff. at 2). While in Charlotte, McGroarty received brochures and other promotional literature, which describe, among other things, Midland Doherty's mortgage services in both Canada and the United States.[5] (McGroarty Aff. Exh.

5. The brochures also describe the services offered by other subsidiaries owned by Midland

B) ("The Mortgage Department's specialists have arranged the sale and purchase of existing mortgages ... to institutional clients throughout Canada, Europe, Australia, and the United States. In addition to its activities within the secondary mortgage market, we arrange financing in the primary mortgage market through our subsidiaries, Midland Doherty Services Ltd. and Midland Doherty Capital Corp.").

In January 1988, Richmar was considering the purchase of several different office buildings, including the Florida Property. (Hoefling Aff. at 1; McGroarty Aff. at 2). In late January 1988, McGroarty telephoned McKenna and indicated that he had several projects on which McKenna might want to help; McGroarty purportedly contacted McKenna because of McKenna's prior solicitations and prior expressions of interest regarding business in North Carolina. (McGroarty Aff. at 3, 5; Plaintiff's Admissions at 4, para. 14). McKenna purportedly expressed an interest in reviewing the information on the projects and asked McGroarty to forward such information to him. (McGroarty Aff. at 3).

McKenna's recollection of the events of January 1988 are as follows:

During the month of January, 1988, I received *an unsolicited* telephone call from Mr. Mark McGroarty. McGroarty, a Canadian citizen and former resident of Ontario, informed me that he had moved back to the United States and that he was in the process of reviewing and considering several real estate transactions. Mr. McGroarty *gratuitously* requested my views. Mr. McGroarty, for the sole purpose of providing me with the necessary background and factual information, arranged to forward a "Preliminary Information Package" containing cash flow and project cost statements for some of the projects considered and undertaken by Richmar. *This was the first communication between Richmar and Midland.*

Doherty Ltd.

(McKenna Aff. at 5–6) (emphasis added). Subsequently, McGroarty sent McKenna the information regarding the projects. (McGroarty Aff. at 3; Plaintiff's Admissions at 5, paras. 15, 17).

On February 24, 1988, Hoefling spoke with McKenna regarding the several prospective real estate purchases, including the Florida Property, and Hoefling answered several questions McKenna asked. (Hoefling Aff. at 2). From that day forward, Hoefling and McKenna had numerous telephone conversations, some of which were initiated by Hoefling and some of which were initiated by McKenna. (McKenna Aff. at 2). All of these conversations concerned Midland Doherty's efforts—as Richmar's mortgage broker and agent—to locate financing for Richmar's purchase of the Florida Property. (Hoefling Aff. at 2).

On February 27, 1988, Midland Doherty received from Richmar another information package regarding the Florida Property. McKenna advised McGroarty that he would review the material and told him that Midland Doherty was dealing with a new potential funding source which might be able to fund the project. (McKenna Aff. at 6; McGroarty Aff. at 3). McKenna purportedly offered (1) to prepare a package to present to the lender for consideration and (2) to attempt to arrange financing—on the condition that if the financing were arranged and the closing took place, Richmar would pay Midland Doherty a broker's fee equal to two percentage points of the principal amount of the loan. (McGroarty Aff. at 3). McKenna asserts that he undertook the task of reviewing the Florida Property documents because "Mr. McGroarty was a Canadian resident and the brother of a friend and business associate." (McKenna Aff. at 6). McKenna, however, never told Hoefling or McGroarty that he was acting simply as a favor or gratuitously on Richmar's behalf; instead—according to Hoefling and McGroarty—McKenna made it very clear that he expected to receive for his efforts a broker's fee equaling two percent of the principal amount of the loan. (Hoefling Aff. at 9; McGroarty Aff. at 3, 4).

McGroarty purportedly accepted McKenna's offer to act as Richmar's mortgage broker for the Florida Property. (McGroarty Aff. at 3; see also McGroarty Aff. Exh. C (copy of mortgage presentation package for Florida Property prepared by McKenna [6])). From that point on, most of the communications between Richmar and Midland Doherty were between Hoefling and McKenna, although McGroarty continued to participate in some telephone conversations with McKenna. (McGroarty Aff. at 3).

On or about February 29, 1988, Hoefling spoke with McKenna by telephone, and McKenna informed him that he had located an overseas funding source that would finance Richmar's purchase of the Florida Property. (Hoefling Aff. at 2). According to Hoefling, McKenna said that obtaining the financing was "a piece of cake" and that the Florida Property met the overseas lender's financing criteria. (Hoefling Aff. at 2).

On March 7, 1988, Richmar entered into a contract with First Union National Bank ("FUNB") to purchase the Florida Property for $7,200,000.00, plus an additional $600,000.00 for improvements to the property. (Complaint Exh. A). Pursuant to the contract of purchase, as amended, Plaintiff Richmar deposited the sum of one hundred thousand dollars ($100,000.00) to be held in escrow by FUNB's attorneys as a deposit to be applied to the purchase price at the time of closing, and posted an irrevocable letter of credit in the amount of one hundred fifty thousand dollars ($150,000.00) as an additional deposit to be applied to the purchase price at the time of closing.

On March 10, 1988, another employee of Midland Doherty, Bill Mahood ("Mahood"), telephone Richmar and requested that Richmar provide additional information, in-

---

**6.** It is interesting to note that in the Section entitled "Summary of Experience and Projects Completed by Principals of Richmar Developments 1982–1987" that McKenna displays a very thorough knowledge of both Hoefling's and McKenna's backgrounds, including McKenna's prior involvement in real estate developments in Charlotte.

cluding pro forma operating statements and a copy of Richmar's purchase agreement for the Florida Property; in accordance with Mahood's request, Hoefling sent the information to McKenna. (Hoefling Aff. at 2–3).

On March 25, 1988, McKenna and Hoefling again spoke by telephone. According to Hoefling, McKenna described the Florida Property transaction with the overseas lender as "a clean deal" and stated that one of Midland Doherty's officers had checked out the overseas lender and the individuals involved and had found them to have extensive real estate experience and to be of the highest quality and reputation. (Hoefling Aff. at 3). According to Hoefling, McKenna on several occasions repeated these statements to McGroarty and Hoefling, as well as to Joseph Tronco ("Tronco"), a Senior Vice President of FUNB who was responsible for selling the Florida Property. (Hoefling Aff. at 3; Tronco Aff. at 2).

On March 30, 1988, McKenna—according to Hoefling—told Hoefling that the overseas lender's trustees were meeting on the next Monday and that Richmar would receive a financing commitment letter for the Florida Property in six days, or at the outside two weeks. (Hoefling Aff. at 4; *see also* McGroarty Aff. at 3–4). Hoefling told McKenna during this conversation that Richmar's deposit binder on the Florida Property would become at risk on April 15, 1988, which meant that Richmar would forfeit the $250,000.00 if it were unable to close the purchase of the Florida Property. (Hoefling Aff. at 4). According to Hoefling, McKenna again reassured him that Richmar would receive a commitment letter and that Richmar's financing package had already been approved.

Between January 22, 1988 and September 19, 1988, forty-two (42) telephone calls were placed from Richmar's office to Midland Doherty's office. (Hoefling Aff. Exh. A (summary of Richmar's long distance telephone billing records)). Between January 19, 1988 and September 7, 1988, Midland Doherty placed forty-seven (47) telephone calls to North Carolina. (McNeely Aff. at 1–2, Exh. A).

In addition to these telephone communications, Richmar received from Midland Doherty a copy of a commitment letter issued by the overseas lender for a Baltimore real estate loan on March 25, 1988, as representative of the terms of Richmar's financing. McKenna also forwarded to Richmar the closing documents concerning another transaction in Maryland, which involved Midland Doherty and which was represented to be similar—although not identical—to the loan documents that would be used in funding Richmar's loan.

On June 29, 1988, Hoefling received a telefax of a letter dated June 22, 1988 from McKenna. The June 22nd letter states, in pertinent part, the following:

We are writing further to your submission for first mortgage financing for the [Florida Property].

As you are aware, our funder encountered certain delays over the past eight weeks with the funding program that was established in Europe, and not to reiterate the delays encountered, its [sic] is safe to say that they now have the situation corrected to both the funding source and our satisfaction.

The Lending Group are now in the process of funding several transactions which proceeded your submission. Subsequently, they have been delayed in issuing you a commitment on your transaction.

Your transaction has been reviewed, is satisfactory, and meets the lending criteria of the funder and we have been advised that your commitment letter is being prepared.

We ask your patients [sic] for a short while longer until we are able to issue to you their commitment to fund. This is expected the week of July 4th.

(Hoefling Aff. Exh. B).

Throughout the summer of 1988, Midland Doherty continued to communicate with Richmar about the loan and its efforts to obtain the funds on Richmar's behalf. (Hoefling Aff. at 6–9).

On or about July 14, 1988, Plaintiff Richmar received a commitment letter from WTC Finance, in which Strongbow, as lend-

er, agreed to lend eight million dollars ($8,000,000.00) to Richmar at a rate not to exceed seven and one half percent (7½%) for a term of twenty years and one day. Richmar executed and returned the commitment letter and the sum of ten thousand dollars ($10,000.00) as a commitment fee to WTC Finance on July 18, 1988.

The funds never arrived in time for the closing date.

On or about August 16, 1988, Plaintiff Richmar's binder of two hundred fifty thousand dollars ($250,000.00) was forfeited when FUNB drew upon Richmar's letter of credit in the amount of one hundred fifty thousand dollars ($150,000.00) and withdrew the one hundred thousand dollars ($100,000.00) cash binder from the escrow account maintained by First Union's attorneys.

On December 12, 1988, Plaintiff commenced the present action against Midland Doherty, Nicely, WTC Finance, and Strongbow. Plaintiff has alleged that all four Defendants are liable for negligent misrepresentation, fraud, and unfair trade practices, N.C. Gen. Stat. § 75–1.1 (1988); in addition, Plaintiff alleges that Midland Doherty is liable for constructive fraud and that WTC Finance and Strongbow are liable for breach of contract. Plaintiff is seeking compensatory damages, lost profits, punitive damages, trebled damages under N.C. Gen. Stat. § 75–16.1, and its attorneys' fees.

This Court's subject-matter jurisdiction over the present case is based upon the complete diversity of citizenship of the parties and the amount in controversy, which exceeds ten thousand dollars ($10,000.00). 28 U.S.C.A. § 1332(a)(3) (West Supp.1989) (suits involving citizens of different states with citizens or subjects of foreign states as additional parties).[7] Venue is proper in the Western District of North Carolina because Plaintiff has its principal office and place of business in this District and because Plaintiff's claims arose in this District. 28 U.S.C.A. § 1391(a) (West 1976).

## IV. APPLICABLE LAW AND ANALYSIS

■ On a motion to dismiss for lack of personal jurisdiction, brought pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the burden is upon the plaintiff to show by a preponderance of the evidence that the court has personal jurisdiction over the defendant. *Marshall Exports, Inc. v. Phillips*, 507 F.2d 47, 49 (4th Cir. 1974) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 183, 189, 56 S.Ct. 780, 782, 785, 80 L.Ed. 1135 (1936)).

■ In diversity cases, a federal district court may assert personal jurisdiction over a defendant if the forum State's statutory law provides a ground and if the defendant has such minimum contacts with the forum State that it is fair to require him to defend there. *E.g., Monroe Hardware Co. v. Robinson*, 621 F.Supp. 1166, 1167 (W.D.N.C. 1985) (Potter, C.J.) (citing *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062 (4th Cir.1982)); *Federal Deposit Ins. Corp. v. Kerr*, 637 F.Supp. 828, 838 (W.D.N.C.1986) (Potter, C.J.); *Munchak Corp. v. Riko Enters., Inc.*, 368 F.Supp. 1366, 1368–69 (M.D.N.C.1973) (explaining two-step process). Stated another way:

A federal court must consider two questions in determining whether it has [personal] jurisdiction over an out-of-state defendant: (1) whether the long-arm statute of the state in which it sits provides authority for the assertion of jurisdiction; and (2) whether the assertion of jurisdiction under the long-arm statute is consistent with the due process requirements of the federal constitution.

*Brown v. American Broadcasting Co., Inc.*, 704 F.2d 1296, 1300 (4th Cir.1983) (citing *Kimbrel v. Neiman–Marcus*, 665 F.2d 480 (4th Cir.1981)). Thus, this Court will proceed to consider whether North Carolina provides a statutory basis for the assertion of personal jurisdiction over Defendant Midland Doherty. If this Court

**7.** For cases commenced after May 18, 1989, the diversity minimum has been raised to $50,-000.00.

finds that such a statutory basis exists, then this Court must determine whether the exercise of personal jurisdiction over Defendant Midland Doherty satisfies the due process requirements of the federal constitution.

### A. *North Carolina's Long–Arm Statute*

There is a clear mandate that the North Carolina long-arm statute be given a liberal construction, thereby making available to the North Carolina courts—and the federal courts in North Carolina—the full jurisdictional powers permissible under federal due process. *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1065 (4th Cir.1982); *Federal Deposit Ins. Corp. v. Kerr*, 637 F.Supp. at 839; *Monroe Hardware Co. v. Robinson*, 621 F.Supp. at 1167; *Hardin v. DLF Computer Co., Inc.*, 617 F.Supp. 70, 71 (W.D.N.C.1985) (Potter, C.J.); *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630–631 (1977).

North Carolina's long-arm statute provides, in pertinent part, the following:

A court of this State having jurisdiction of the subject matter has jurisdiction over a person served in an action ... under any of the following circumstances:

(4) Local Injury: Foreign Act.—In any action for wrongful death occurring within this State or in any action claiming injury to person or property within this State arising out of an act or omission outside this State by the defendant, provided that at or about the time of the injury either:

a. Solicitation or service[ ] activities were carried on within this State by or on behalf of the defendant. . . .

N.C.Gen.Stat. § 1–75.4(4) (1983).

An alternative state statutory ground relied upon by Plaintiff to support a finding of personal jurisdiction is Section 55–145(a) of the North Carolina General Statutes, which provides, in pertinent part, the following:

(a) Every foreign corporation shall be subject to suit in this State, whether or not such foreign corporation is transacting or has transacted business in this State and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows:

(1) Out of any contract made in this State or to be performed in this State; or

(4) Out of tortious conduct in this State, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

N.C.Gen.Stat. § 55–145(a)(1), (4) (1982) (regarding jurisdiction over foreign corporations not transacting business in North Carolina).

Plaintiff has relied on both of these statutes to support a finding of personal jurisdiction over Defendant Midland Doherty, but this Court will confine its discussion to Section 55–145(a)(4) because Defendant Midland Doherty's alleged conduct falls clearly within the purview of that statute.

"[W]hen seeking to acquire personal jurisdiction under § 55–145(a)(4) a plaintiff must show: (1) the cause of action arose in North Carolina; and (2) the defendant committed one or more acts which gave rise to the cause of action [in this State]." *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1065 (4th Cir.1982); *Munchak Corp. v. Riko Enters., Inc.*, 368 F.Supp. 1366, 1370 (M.D.N.C. 1973). In North Carolina, " '[t]he place of a wrong is in the state where the last event takes place which is necessary to render the actor liable for an alleged tort.' " *Id.* (quoting *Farmer v. Ferris*, 260 N.C. 619, 627, 133 S.E.2d 492, 498 (1963)). The last event necessary to render the actor liable is the damage suffered as a consequence of the tortious conduct, and, therefore, a tort cause of action may be considered to arise where the plaintiff is located and suffers the damages. *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d at 1065 (citing *Munchak Corp. v. Riko Enters., Inc.*, 368 F.Supp. at 1370). In the present case, Richmar's cause of action against Defendant Midland Doherty arose in North

Carolina because Richmar allegedly suffered harm in North Carolina as a North Carolina company. Thus, the first prong of the above-described two-part test is satisfied.

■ Midland Doherty's extensive communications with Richmar in North Carolina—all made in connection with the Florida Property—constitute tortious conduct occurring in North Carolina and, thus, fulfill the second prong of the above-described two-part test. Richmar's claims against Midland Doherty for negligent misrepresentation, fraud, constructive fraud, and unfair and deceptive trade practices all arose from the numerous and extensive communications between Midland Doherty and Richmar. The telephonic and written communications sent by Midland Doherty from Canada to Richmar in North Carolina may be deemed under Section 55–145(a)(4) to be "tortious conduct" occurring in North Carolina. As the United States Court of Appeals for the Fourth Circuit noted in *Vishay Intertechnology, Inc. v. Delta International Corporation*, 696 F.2d 1062,

> "We would be closing our eyes to the realities of modern business practices were we to hold that a corporation subjects itself to the jurisdiction of another state by sending a personal messenger into that State bearing a fraudulent misrepresentation but not when it follows the more ordinary course of employing the United States Postal Service as its messenger.... Where a defendant knowingly sends into a state a false statement, intending that it should then be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that State."

*Id.* at 1066 (quoting with approval *Murphy v. Erwin–Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir.1972) (citations and footnote omitted)); *Burger King Corp. v. Rudewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) ("Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an unescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.").

■ In *Vishay*, the United States Court of Appeals for the Fourth Circuit held that personal jurisdiction over a California defendant existed under Section 55–145(a)(4) because the defendant sent three letters and made five telephone calls to a North Carolina plaintiff, which was suing the defendant for slander, unfair business practices, tortious interference with contract, and abuse of process. In the present case, Midland Doherty's numerous telephone calls—some of which allegedly contained false and misleading statements—purportedly caused Richmar to suffer injury in North Carolina. Midland Doherty's acts in the present case are equivalent to the acts committed by the defendant in *Vishay*, and they, thus, constitute tortious conduct occurring in North Carolina. Thus, the cause of action arose in North Carolina, and Defendant Midland Doherty's tortious conduct occurred in North Carolina; both prongs of the two-part test are satisfied, and, therefore, Section 55–145(a)(4) may be used as a state statutory basis for the assertion of personal jurisdiction over Midland Doherty.

### B. *Due Process*

Due process requires that a defendant who is not present within the forum state "have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)); *Brown v. American Broadcasting Co.*, 704 F.2d 1296, 1301 (4th Cir.1983). Due process, thereby, "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudewicz*, 471 U.S. 462, 472–473, 105 S.Ct. 2174, 2181–2182, 85 L.Ed.2d 528 (1985) (quoting *International Shoe*, 326 U.S. at

319, 66 S.Ct. at 159). In addition, the federal constitution requires that "in each case ... there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *August v. HBA Life Ins. Co.*, 734 F.2d 168, 172 (4th Cir.1984).

As this Court has noted on many occasions:

> The criteria for determining whether minimum contacts exist include: (1) the quantity of contacts, (2) the nature of and quality of contacts, (3) the source and connection of the cause of action with those contacts, (4) the interests of the forum state and convenience, and (5) whether the defendant invoked the benefits and protections of the law of the forum state.

*Federal Deposit Ins. Corp. v. Kerr*, 637 F.Supp. 828, 839 (W.D.N.C.1986) (Potter, C.J.) (citing *Southern Case, Inc. v. Management Recruiters Int'l, Inc.*, 544 F.Supp. 403 (E.D.N.C.1982)); *Monroe Hardware Co. v. Robinson*, 621 F.Supp. 1166, 1168 (W.D.N.C.1985) (Potter, C.J.); *Hardin v. DLF Computer Co., Inc.*, 617 F.Supp. 70, 71–72 (W.D.N.C.1985) (Potter, C.J.).

■ "The casual presence or isolated activity of a defendant in the forum state are not enough to supply the minimum contacts." *Federal Deposit Ins. Corp. v. Kerr*, 637 F.Supp. at 839 (citing *Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502 (4th Cir.1956)); *Chung v. NANA Development Corp.*, 783 F.2d 1124, 1126 (4th Cir.) (an "isolated" or "attenuated" single transaction has always been deemed inadequate to satisfy due process), *cert. denied*, 479 U.S. 948, 107 S.Ct. 431, 93 L.Ed.2d 381 (1986). On the other hand, a single transaction may be sufficient to satisfy the requisite minimum contacts if it gives rise to the liability asserted in the suit. *Hardy v. Pioneer Parachute Co., Inc.*, 531 F.2d 193, 195 (4th Cir.1976) (products liability action); *see also McGee v. International Life Ins. Co.*, 355 U.S. 220,

78 S.Ct. 199, 2 L.Ed.2d 223 (1957). As the United States Court of Appeals for the Fourth Circuit has explained:

> Critically, where jurisdiction is asserted in respect of a claim "arising out of or related to the defendant's contacts with the forum" (specific jurisdiction) the contacts required by due process to support jurisdiction need not rise to the level of the "systematic and continuous" contacts required to support an assertion of jurisdiction in respect of a claim that does not arise from or bear relation to the contacts (general jurisdiction). In a given case, therefore, contacts that would not constitutionally justify an exercise of general jurisdiction might support an exercise of specific jurisdiction. Indeed, where authorized by state law, a single contact by a nonresident defendant may, if sufficiently "purposeful" in its aim at, and sufficiently egregious in its impact upon, a forum state's legitimate interests, support a constitutional exercise of specific jurisdiction in respect of a claim arising from that very contact.

*First American First, Inc. v. National Ass'n of Bank Women*, 802 F.2d 1511, 1516 (4th Cir.1986) (citations omitted); *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d at 1068 ("In determining whether due process is satisfied, it is significant that the cause of action arises out of the defendant's contacts with the forum state.").

The courts apply these constitutional standards "on a case by case basis, determining what is fair, reasonable, and just according to the circumstances." *Id.* at 1068. This Court will proceed to analyze the facts of the present case in light of these constitutional guidelines.

(1) *Quantity and Quality of Defendant's Contacts*

■ Contrary to Midland Doherty's assertions, its contacts with Richmar and North Carolina were not sparse, isolated or unintentional. Richmar's evidence establishes the following:

(a) Prior to January 1988, McKenna had written McGroarty and had inquired how

Midland Doherty might be of service to McGroarty in *both* the Canadian *and* U.S. *markets* and asked that Midland Doherty be given the opportunity to prove itself to be an effective ally of McGroarty;

(b) Midland Doherty's promotional brochure for its mortgage and real estate investment services boasts that its specialists execute the sale and purchase of existing mortgage portfolios to institutional clients throughout Canada, Europe, Australia, and the United States;

(c) Prior to January 1988, McKenna requested on several occasions that McGroarty contact him if an opportunity arose for Midland Doherty to do business with McGroarty in North Carolina;

(d) As a direct result of McKenna's prior solicitations, McGroarty contacted McKenna in January 1988 regarding financing for the Florida Property. McKenna expressed interest in the project and asked for additional information;

(e) After receiving the information requested, McKenna subsequently telephoned McGroarty and offered to present a mortgage loan package to an overseas lender on Richmar's behalf, on the condition that Midland receive a fee of two percent of the loan amount if Richmar purchased the property with the financing arranged by Midland Doherty; McGroarty accepted the offer; throughout McKenna's dealings with Richmar— and despite delays in obtaining the financing—McKenna continued to insist that he collect the full amount of his broker fees;

(f) Richmar considered itself to be a client of Midland Doherty and considered McKenna to be a broker and an agent working on Richmar's behalf;

(g) Between January 22, 1988 and September 19, 1988, forty-two (42) telephone calls were placed from Richmar's office to Midland Doherty's office. (Hoefling Aff. Exh. A (summary of Richmar's long distance telephone billing records)); and

(h) Between January 19, 1988 and September 7, 1988, Midland Doherty placed forty-seven (47) telephone calls to North

Carolina, the vast majority of which concerned Richmar's loan. (McNeely Aff. at 1–2, Exh. A).

This Court is of the opinion that these contacts—and other contacts mentioned above—are sufficient to require Defendant Midland Doherty to come to North Carolina to defend against Plaintiff's claims, which arose from Defendant's contacts with North Carolina. Controlling precedent in this District supports this conclusion. In *Vishay Intertechnology, Inc. v. Delta International Corporation,* 696 F.2d 1062, the United States Court of Appeals for the Fourth Circuit found that a California defendant had sufficient minimum contacts with the forum to satisfy due process, even though in *Vishay* the defendant's contacts were substantially less than Midland Doherty's contacts with North Carolina.

#### (2) *Connection Between Claims and Defendant's Contacts*

Defendant Midland Doherty's recent contacts with North Carolina—some of which are listed above—all appear to be related to Midland Doherty's relationship with Richmar and to Midland Doherty's efforts regarding the financing for the Florida Property. Thus, there is a substantial connection between Midland Doherty's contacts with North Carolina and Plaintiff's claims.

#### (3) *Interests of Forum State*

Each state has a strong interest in providing effective means of redress for its residents. *Burger King Corp. v. Rudewicz,* 471 U.S. at 474, 105 S.Ct. at 2183; *First American First, Inc. v. National Ass'n of Bank Women,* 802 F.2d 1511, 1516 (4th Cir.1986) (citing *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)). North Carolina has strong interests in the present action: (a) Plaintiff is a North Carolina resident, and it obviously provides substantial benefits to North Carolina's economy; (b) Plaintiff seeks relief under the North Carolina unfair trade practices statute; (c) Plaintiff's damages were suffered in North Carolina; and (d) Defendant Midland Doherty's contacts with North

Carolina are essential elements of Plaintiff's tort claims. *See Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d at 1069. In sum, Plaintiff is not a mere forum shopper; instead, Plaintiff has its corporate residence in this District and has developed residential and commercial real estate projects within this District. North Carolina and this District have strong interests in protecting the corporate entities that are contributing to the economic well-being of the area. This is especially true when those economic interests are threatened by conduct purposefully directed at a North Carolina corporation.

Further, when this Court has to make a choice of law determination in this case, it appears that North Carolina's law will govern since North Carolina's interests in this litigation are at least as strong as the other potential jurisdiction's interests—including Florida, Maryland, and Canada. Indeed at this early point, it appears that North Carolina is the most interested jurisdiction because North Carolina has the most substantial relationship to the parties and the cause of action.

All of these factors weigh heavily in favor of this Court's exercise of personal jurisdiction over Defendant Midland Doherty.

#### (4) *Defendant's Expectation of Being Haled into North Carolina*

■ Defendant Midland Doherty and its officers knew, or should have known, that their intentional activities directed towards Richmar in North Carolina might result in them being required to come to North Carolina either (1) to protect Midland Doherty's interests or (2) to answer for any wrongs arising from Midland Doherty's activities. Midland Doherty sought an opportunity to do business in North Carolina; Richmar gave Midland Doherty that opportunity and suffered injury as a result of Midland Doherty's alleged fraud and negligence. After having intentionally availed itself of the benefits of transacting business with a North Carolina corporation, Midland Doherty cannot now seek to evade the concomitant obligations. As the United States Supreme Court has noted:

> [W]here individuals "purposefully derive benefits" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.

*Burger King Corp. v. Rudewicz*, 471 U.S. at 474–475, 105 S.Ct. at 2183 (citations omitted).

#### (5) *Convenience of the Parties*

Plaintiff, obviously, wants to litigate its claims in North Carolina because that is where its corporate residence is located and where its corporate officers reside. If this case comes to trial, Hoefling and McKenna will probably have to testify, and they will find it easier to come to court in this District rather than Florida, or Maryland, or Canada.

Defendant, on the other hand, will undoubtedly find it inconvenient to litigate in this District and would prefer to litigate in its home territory, Canada; Florida and Maryland, however, would not be any more convenient than North Carolina. Although the federal court should be aware of the serious burdens an alien defendant faces when forced to litigate in a unfamiliar forum, *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 1034–35, 94 L.Ed.2d 92 (1987), in the present case North Carolina's interests outweigh the burdens placed upon Midland Doherty, which purposefully conducted activities directed at a North Carolina corporation and its economic interests.

■ Considering all of the above factors, this Court is of the opinion that it

is constitutionally permissible to exercise personal jurisdiction over Midland Doherty for the following reasons:

(a) Midland Doherty has purposefully created sufficient minimum contacts with the forum state;

(b) such contacts directly relate to Plaintiff's claims; and

(c) it is fair and reasonable, under the circumstances, to hale Midland Doherty into this District to defend against Richmar's claims, which Midland Doherty could have, or should have, reasonably foreseen.

## V. CONCLUSIONS

For the reasons stated in this Order,

IT IS ORDERED that Defendant Midland Doherty Services, Ltd.'s Motion to Dismiss, filed February 13, 1989, shall be, and hereby is, DENIED.